## El Pueblo *v.* Díaz *alias* Leña Verde.

Apelación procedente de la Corte de Distrito de Humacao.

No. 55.—Resuelto en marzo 6, 1907.

Apelación—Pruebas—Veredicto—Nuevo Juicio.—La fuerza probatoria que haya de darse á la prueba de cargo, en aquella parte en que hubiere sido contradicha ó explicada por la de descargo, es cuestión que corresponde exclusivamente al jurado, y que no está sujeta á revisión por el tribunal de apelación, y en los casos en que el veredicto fuere contrario al peso de la prueba, el acusado, fundado en ese motivo, debe solicitar la celebración de un nuevo juicio, siendo materia de discreción la concesión ó denegación del mismo.

Id.—Veredicto Manifiestamente Erróneo ó Resultado de Parcialidad, Pasión ó Prejuicio.—Como regla general puede establecerse la de que el Tribunal Supremo no modificará en apelación la decisión del jurado con respecto á una cuestión de hecho, á no ser que sea manifiestámente errónea, ó resultado de prejuicio, pasión ó parcialidad.

Id.—Recomendación de Clemencia.—El juez no está obligado á mitigar el castigo que haya de imponer al acusado, simplemente por que el jurado, al emitir su veredicto, hubiere recomendado clemencia para el acusado, pues aparte de que tal recomendación no puede considerarse como elemento constitutivo del veredicto, en el que el jurado debe limitarse á declarar al acusado culpable, ó no culpable, determinando el grado del delito cuando deba hacerlo, es el juez el que tiene la responsabilidad de imponer la sentencia al acusado, y puede, por consiguiente, hacer caso omiso de aquella recomendación.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Vías Ochoteco.*

Abogado del apelado: *Sr. Rossy, Fiscal.*

El Juez Asociado Sr. MacLeary emitió la opinión del tribunal.

El presente caso se inició y resolvió en la Corte de Distrito de Humacao, en cuya corte se presentó una acusación contra el acusado Demetrio Díaz, por haber dado muerte á Agustín Belford, alegándose que dicho crimen fué cometido en 28 de enero de 1905 en el Distrito de Humacao. Esta acusación tiene fecha de 9 de marzo de 1905. El acusado fué primeramente declarado culpable de asesinato en primer grado y condenado á muerte. Contra esa sentencia intérpuso apelación para ante esta corte, revocando este tribunal en 20 de

abril 1906 la sentencia que contra dicho acusado pronunciara el tribunal sentenciador. El Juez Presidente Sr. Quiñones emitió la opinión del tribunal, basando la revocación en el fundamento que el veredicto fué informal, porque el jurado dejó de expresar el grado del delito de asesinato del que fué encontrado culpable el acusado; y hace referencia á la sentencia que con anterioridad dictara este tribunal en la causa de Panchito, citando también otras autoridades. En 10 de mayo, 1906, la Corte de Distrito de Humacao señaló el juicio de la causa para el día 18 de junio siguiente.

El segundo juicio tuvo lugar en 19 de junio, 1906. El veredicto del jurado en ese juicio declaró al acusado culpable del delito de asesinato en segundo grado, recomendando clemencia para dicho acusado. El juez sentenciador instruyó al jurado muy ampliamente y con mucha habilidad, incluyendo también algunas instrucciones que la defensa solicitó se dieran al jurado con respecto á la cuestión de duda razonable. No se ha hecho alegación alguna en contra de estas instrucciones, no debiendo ocuparnos más de ellas por ahora.

En 25 de junio de 1906 se condenó al acusado á presidio perpétuo con trabajos forzados y al pago de las costas, y en 25 de agosto siguiente, el abogado del acusado interpuso recurso de apelación. En 26 de noviembre último, se presentó en esta corte la transcripción de los autos, presentando en este tribunal una declaración jurada (*affidavit*) en 22 de enero de este año el Sr. J. F. V. Ochoteco, en la que se solicitaba se prorrogara la vista de la causa en esta Corte Suprema hasta fines de febrero, alegando como fundamento de su solicitud que existía un convenio entre el Fiscal del Distrito de Humacao y el abogado del acusado, á fin de qué se prorrogara el término para la preparación y presentación de la exposición del caso, hasta fines de febrero; y que el Secretario de la Corte de Distrito de Humacao no teniendo en cuenta este convenio, había remitido los autos de la causa á la Corte Suprema. Que fué la intención del abogado presentar el mencionado docu-

mento dentro del término convenido por él con el Fiscal. Entonces se señaló para la vista de la causa el día 15 de febrero, presentando el abogado en cinco de febrero en esta corte un documento titulado pliegos de excepciones del caso. En este pliego se especifica en forma narrativa las declaraciones de los testigos, mostrando, además, dos fundamentos legales por los que el acusado solicita la revocación de la sentencia; esto es, *Primero:* que el veredicto es contrario á la prueba; y que, según los hechos probados, no resulta un delito mayor que el de homicidio; *Segundo:* que la corte sentenciadora fué muy excesiva en la imposición de la pena al condenar al acusado á cadena perpétua, puesto que el jurado había pedido clemencia para el acusado.

Esta exposición del caso fué aprobada por ambas partes y admitida por la corte. La vista del caso tuvo lugar ante esta corte en 15 de febrero de 1906, presentando la representación de las partes sus respectivos alegatos, sin que ninguna de ellas presentara alegaciones por escrito (*briefs*), excepción hecha de un corto informe del fiscal, comprendiendo una parte de una página presentada en 29 de diciembre último, antes de haber sido recibido en esta corte la exposición del caso.

El primer fundamento que alega el acusado y por el cual solicita la revocación de la sentencia exige un completo análisis de la prueba tomada en consideración por la corte sentenciadora, y sobre la cual se basó el veredicto del jurado.

La prueba presentada durante el juicio, tomándola del pliego de excepciones, puede resumirse en la forma siguiente:

"1. El testigo *Doctor Pablo Font Martelo,* declaró que conocía á Agustín Belford, que murió á consecuencia de lesiones recibidas en la noche del 28 al 29 de diciembre de 1905, una en el cuello y la otra en la espalda entre las costillas, interesando esta última el pulmón; que la herida del cuello fué infligida después de haber sido herido el agresor, y la de la espalda, pasando el agresor el brazo derecho que portaba el arma por debajo del brazo izquierdo del herido; que lo ha creído así por la misma dirección de la herida, porque generalmente la persona que va á asestar una herida por la espalda toma esa posi-

ción por ser muy fácil de ese modo lograr su intento; que la lesión que interesó el pulmón causó la muerte del interfecto con motivo de un proceso inflamatorio; que se tomaron puntos en dichas heridas, las que fueron curadas, empleando todos los medios que indica la ciencia.

"2. El testigo *Ernesto Belford* declaró que él es hijo de Agustín Belford; que pasando Demetrio y Nicolás Gómez y Facio por la casa de Demetrio, este último dijo que iba á bañarse en la sangre del padre del testigo, el que estaba atrás en la cocina y se puso á darle algunos consejos; que no vió cuando Demetrio le dió, viéndolos luchar cuerpo á cuerpo y cuando cayeron al suelo; que él entonces se escondió detrás de unas matas de Pacholí, y Facio dijo: "Huye, Ernesto, pues te cojerán," diciéndole el padre que fuera á buscar á Sánchez, y cuando llegó á la casa ya su papá estaba allí; que vió á su padre herido, y cuando se emburujaron; que Belford estaba en la cocina de su propio casa; que Demetrio Díaz se presentó en forma descompuesta, profiriendo palabras insultantes; que Nicolás Gómez le acompañaba; que no vió que llevara nada en sus manos; que tiene una hermana, Antolina Belford, quien estaba cerca; que no sabe si Belford atacó á Demetrio Díaz, ó si atacó á Belford, porque la noche estaba obscura; que en todo el tiempo que estaba agarrado con Demetrio no vió á su padre, y que su padre habló á éste último (Demetrio) en forma correcta; que á eso de las diez de la noche estaba su padre atando un animal detrás de la cocina; que Díaz dijo que iba á bañarse en la sangre de aquel tórtolo; que Díaz estaba acompañado de Facio y Nicolás y que el primero le mandó correr; que está seguro de que Nicolás Gómez estaba allí; que antes de esconderse estaba en la casa acostado, levantándose al oir lo que dijo Díaz; que cuando Díaz dijo la expresión de tórtolo ya su padre estaba fuera de la casa volviendo él entonces á entrar en ella, cogiendo una varilla de hierro y saliendo nuevamente sin saberse para donde marchaba; que además de Demetrio Díaz, el individuo Nicolás Gómez tomó parte en el encuentro con su padre; que únicamente Díaz y Belford sostenían la pelea cuerpo á cuerpo; que el nombre de sus madre es Felipa Díaz que es la concubina de Demetrio Díaz; que los disgustos entre Demetrio Díaz y Belford eran motivados por Díaz querer corregir los hijos de su padre, lo que no le gustaba á su padre; que su padre usaba la pequeña varilla de hierro para defenderse de los perros.

"3. El testigo *Nicolás Gómez* declaró que conocía á Agustín Belford, y que la última noche que le vió fué la noche en que fué herido por Demetrio Díaz; que Díaz pasó por su casa aquella noche, dió las

buenas noches y siguió su camino; que á eso de la una de la madrugada el testigo salió con Bonifacio Gutiérrez, que pasaron por el camino de la casa de Belford, encontrándole herido; más adelante encontraron á Demetrio Díaz que dijo: "Le he quitado esa varilla á Agustín Belford;" que al decir ésto Díaz, el declarante se fué á ver si encontraba uno de los hijos de Belford, para que lo avisara al juez de paz; que corrió porque temía á Díaz; que Díaz había tratado de castigarle anteriormente; que Belford le dijo que Díaz le había herido; que no estaba allí Ernesto Belford; que vió á Belford en el camino cerca de su casa con una herida delante; que Demetrio Díaz estaba á unas dos varas de distancia, no viéndole nada en su manos, pues la noche estaba obscura; que habló con Belford, quien le manifestó adonde había sido herido, así como también que Demetrio Díaz le había herido; que al hablar el herido salía mucha sangre por su boca; que no vió que Díaz llevara arma alguna porque no llegó donde él.

"4. *Bonifacio Gutiérrez* declaró que vive en el barrio de 'Buena Vista,' de Humacao; que salía para un velorio y tenía que pasar por la casa de Belford, y que al pasar por dicha casa oyó que Demetrio Díaz dijo: "Ven acá, que te voy á acabar de matar;" que siguió su camino y se encontró con Agustín parado cerca de su casa, siguiendo entonces para el sitio donde había salido; que las palabras referidas fueron pronunciadas por Leña Verde; que cuando dijo eso él echó á correr, porque él (Leña Verde) era un hombre que siempre estaba profiriendo insultos; que había tenido disgustos con Leña Verde con anterioridad; que no vió si Leña Verde tenía algo en sus manos; que Belford y Leña Verde estaban siempre peleando por Felipa Díaz, que era la mujer de Belford y vivía con Demetrio Díaz y tenía hijos de Belford; que Belford le aconsejaba á Leña Verde que estuviera quieto; que no vió á Ernesto Belford pero que vió á Belford el maestro; que sintió que pasaba Demetrio Díaz; que Belford estaba cerca de la casa y Demetrio Díaz trataba de pegarle; que otra noche, hará dos meses, (Leña Verde) le había dicho (Belford) que donde quiera que le viera le mataría.

"5. *Antolina Belford,* hija de Agustín Belford, declaró que la causa de la muerte de su padre fué Demetrio Díaz, y que ella sabe que el mencionado Díaz hirió á su padre porque él se lo dijo; que el crimen se cometió por la noche, después que ella se había retirado á dormir á eso de las diez; que su padre llegó á su casa con la mano puesta en la garganta y al preguntarle qué le ocurría, contestó que el infame Demetrio Díaz le había herido; que oyó á Demetrio Díaz decir

que su padre le hedía á negro tórtolo; que ella conoció la voz de Díaz, que era vecino, quien pronunció aquellas palabras en voz natural; que todos vivían en terrenos de Felipa Díaz; que Leña Verde había vivido con Felipa Díaz un año y cuatro meses; que Belford siguió viviendo en el terreno de Felipa después de haberse ido ésta con Leña Verde; que ella vivía con su madre y Belford daba consejos á Demetrio Díaz, porque así lo manifestaba Demetrio; que ella oyó dichas palabras la noche del suceso como una hora antes; que vió á Ernesto Belford cuando vino á buscar á Tomás Sánchez.

"6. *Tomás Sánchez* declaró que era yerno de Belford, y que Belford y Díaz habían tenido disgustos con anterioridad, porque el último le pegaba á sus hijos; que Demetrio Díaz se quería con la mujer de Belford; que Belford vivía en terrenos de Carmelo Díaz donde también vivía Demetrio Díaz; que cuando Felipa Díaz se fué con Demetrio hacía tiempo que no vivía con Belford; que habían estado separados; que él tenía un hijo en su casa, pero nó los otros, porque la madre no se los daba; que Demetrio Díaz, exceptuando el querer castigar á sus hijos, no dejó de respetar jamás á Belford.

"7. *Rafael Tirado*, Juez Municipal, declaró que practicó las primeras diligencias del caso de *El Pueblo* v. *Díaz;* que ocupó una varilla de hierro; que hizo una investigación, auxiliado por el comisario del barrio y el sub-marshal de la corte en la casa del acusado, donde encontró una varilla manchada de sangre, y al preguntarse á la mujer de Diez sobre dicha varilla, dijo que Demetrio Díaz la había traído; que cuando Belford declaró ante el juez municipal, podía verse que estaba muy grave, y que se iba á morir, declarando todo lo concerniente al crimen; habiendo declarado que dicho individuo había venido á su casa, profiriendo algunas palabras ofensivas, que había salido fuera, y el otro le había tirado con un cuchillo, causándole una herida; que sostuvo una lucha cuerpo á cuerpo, á fin de defenderse, recibiendo la otra herida; que el herido le había dicho que estaban presentes dos muchachones y que uno de ellos azuzaba al otro para que le diera; que cree que le dijo que era un tal Torres ó Sánchez, no recuerda bien; que Belford le manifestó que estando él en su casa se presentó aquel hombre acompañado de dos individuos; que él le insultó, y que trató que el otro se retirara, pero no le obedeció; que se le fué encima asistido de uno de esos individuos que le acompañaba y le asestó un golpe; que al írsele encima, cuerpo á cuerpo, y tratar de defenderse el otro le volvió á agolpear; que el herido se

refería á Demetrio Díaz; que habló de otra persona, pero que no recuerda si era Sánchez ó Torres.

"8. El testigo *Lorenzo Isern* declaró que estaba en Humacao en la fecha del crimen; que conocía á Agustín Belford y recuerda que declaró ante el juez municipal, estando herido de gravedad, pero que estaba en su conocimiento y que él, el testigo, firmó la declaración que se le presentó por autorización de Belford.

"9. El testigo *Schabee*, que en enero del año pasado conoció á Agustín Belford, y que habiendo sido herido lo llamó como su pastor porque se sentía que estaba peligrosamente herido; que le manifestó que había llegado á su casa encontrando en la parte de afuera á un hombre que lo insultaba; que salió y lo agarró, y antes de darse cuenta se sintió que estaba herido dos veces.

"10. Llamado de nuevo el testigo *Rafael Tirado Verrier* declaró que ocupó una varilla de hierro por conducto del sub-marshal de la corte que se la entregó en su casa; que fué la misma varilla, encontrando en ella una mancha al parecer de sangre.

"11. Llamado nuevamente el testigo *Ernesto Belford,* declaró que conoce la varilla de hierro que se le presenta como la misma que sacó su padre aquella noche, y que siempre la cojía por el mango.

"12. *Doctor Isidoro A. Vidal* declaró que hace algún tiempo que conoce á Demetrio Díaz y reconoció á este individuo á petición de la defensa, encontrando en su brazo derecho una herida originada con un cuerpo duro, como por un hierro ó un palo; que esa herida se había causado hacía unos seis ú ocho meses con una varilla pequeña ó un garrote; que no puede decir el día que se infirió esa herida, sino, aproximadamente.

"13. Llamado de nuevo el testigo *Doctor Pablo Font Martelo,* declaró que reconoció á Demetrio Díaz, encontrándole una herida en su brazo derecho; que hacía cinco ó seis meses que había reconocido la herida; que dicha herida fué superficial; que pudo haber sido causada con una varilla ó con cualquier otro cuerpo duro ó contundente; que la herida de Belford produjo poca hemorragia, y la de la espalda fué la que causó la muerte y manaba más sangre.

"14. El acusado, *Demetrio Díaz,* declaró que conocía á Agustín Belford viviendo con una mujer que fué primeramente mujer del referido Belford, una concubina; que conoce la varilla que se le presenta que es de Agustín Belford; que salía del pueblo y que al pasar por la casa de Nicolás Gómez le dijo á éste que le esperara; que él esperó y al llegar frente á la casa de Agustín Belford éste último salió al camino con esa varilla, y sin hablar una palabra le dió un azote con

ella, teniendo una reyerta en la que tomó parte Nicolás; que él no lle, vaba arma alguna, que cuando los dos se echaron manos, él cogió la varilla y se la llevó para su casa; que entonces se quedó en su casa y Nicolás y Facio le hicieron huir; que estaba huyendo y le escribió á Don Emilio para que lo fuera á buscar; que él mismo se presentó á Don Emilio y desde entonces está sometido á los tribunales; que mientras se hallaba en fuga, trabajaba en la hacienda "Constancia," cambiándose el nombre porque supo que por la policía se le perseguía; que Nicolás Gómez tenía un cuchillo con cabo de chifle, y que trataba de que lo tomara cuando tuvo la reyerta, pero que no lo quiso aceptar; que no vió cual fué la primer herida que le dió; que llevó un pantalón y una camisa manchada con sangre á consecuencia de la herida de la muñeca; que al pasar con Nicolás Gómez por frente á la casa de Belford este último salió al camino, dándole un golpe, cayendo en tierra el testigo; que él y Belford sostuvieron una lucha cuerpo á cuerpo, cayéndose al suelo, y entonces él tomó la varilla y vió que Gómez le tiró á Belford una puñalada; que no llevaba armas esa noche; que Belford no sostenía sus hijos, ni nunca se los había reclamado; que él los había educado, y como Belford no trabajaba, nunca les envió nada para el sostenimiento de los mismos.

"15. La testigo *Antonia Belford* declaró que oyó decir á Demetrio Díaz, después del hecho, "tenga compay ese cuchillo, cójalo y rómpalo"; que ella no sabe que se hizo del cuchillo, no oyendo nada más; que Belford acostumbraba llevar una varilla cuando salía; que la verdad es que Díaz dijo á Nicolás Gómez, "tome ese cuchillo y bótelo."

"16. Llamado de nuevo el testigo *Nicolás Gómez* declaró que él no había herido á Belford, quien era para él como un padre; que él defendió á su familia y la salvó del ciclón; que llegó al lugar del crimen después que Belford había sido herido, no habiendo visto allí á Leña Verde; que iba acompañado de Bonifacio.

"17. Llamado otra vez el testigo *Bonifacio Gutiérrez* declaró que no vió que Nicolás Gómez hiriera á Belford, ni vió la varilla en manos de Leña Verde."

De un estudio detenido de los hechos que pueden deducirse de la anterior exposición, no estamos conformes en que el jurado no estuvo justificado en dar un veredicto de asesinato en segundo grado. Es cierto que si el jurado hubiese dado un veredicto de homicidio, dicho veredicto no hubiera sido modificado por esta corte, pero indudablemente los hechos de-

muestran que el asesinato fué cometido con malicia tácita; esto es, con la deliberada intención de quitar la vida ilegalmente al interfecto, sin que resultara notable provocación, y bajo tales circunstancias que demuestran un corazón pervertido y maligno.  Es innecesario el expresar cuál hubiera sido la resolución de esta corte si el veredicto hubiera sido por asesinato en primer grado; habiéndose anulado una sentencia anterior que condenaba á muerte al acusado, por informalidad en el veredicto del jurado, no existiendo pliego de excepciones ó relación de hechos que mostrara la prueba practicada durante el juicio.

Ha sido una cuestión objeto de gran discusión el determinar hasta donde llega la jurisdicción de una corte de apelación al revocar una sentencia, fundada dicha revocación en que el veredicto del jurado no está sostenido por la prueba. Un gran número de los casos que se encuentran en los libros sostienen que la resolución del jurado, basada en la prueba, no debe ser modificada en la apelación.  En algunos casos se ha resuelto, casi en el mismo sentido, que si la prueba no es bastante para dar un veredicto fundado en ella, dicho veredicto puede ser anulado en la apelación.  Pero estas opiniones amenudo dejan de expresar hasta dónde puede una corte de apelación proceder á considerar la importancia de la prueba en causas criminales en cuyas pruebas está basado el veredicto del jurado.  Sería quizás muy difícil, si no imposible, deducir de los casos anotados una regla sobre esta materia que pueda considerarse como que ha sido adoptada por todas las cortes. En Florida, Illinois y Texas las cortes han resuelto que es suficiente motivo para que se revoque una sentencia condenatoria el que la corte de apelación tenga una duda razonable con respecto á la culpabilidad del acusado.  En muchos otros Estados, entre ellos los de Idaho, Indiana, Iowa, Kentucky, Louisiana, Michigan, Missouri, New York y Virginia, puede decirse que la regla establecida por las decisiones de dichas cortes, es que no se modificará una sentencia en causa crimi-

nal por el fundamento de que el veredicto no está sostenido
por la prueba, excepto en casos en que hay una falta absoluta
de prueba, ó la misma es tan insignificante y tan poco satis-
factoria, que la deducción que necesariamente puede hacerse
de dicha prueba es que el veredicto es el resultado de parcia-
lidad, apasionamientos ó prejuicios. La última regla ha sido
sostenida por la Corte Suprema de los Estados Unidos en el
caso de *Crumpton* v. *United States,* 138 U. S., 361. En Cali-
fornia se ha dicho, ó ha sido la resolución de su corte de último
recurso, que solamente pueden considerarse cuestiones de de-
recho en la apelación, y si hay alguna prueba que justifique el
veredicto del jurado, dicho veredicto no puede ser modificado.

> *People* v. *Williams,* 59 Cal., 674.
> *People* v. *Smallman,* 55 Cal., 185.

Esta cuestión se ha discutido, aunque ligeramente, en una
nota que se encuentra en el caso de *Armstrong* v. *El Estado de
Florida,* cuyo caso se encuentra anotado en 17 *Lawyers Re-
ports Annotated,* en la página 484. Estamos de acuerdo con la
regla establecida por la Corte Suprema de los Estados Uni-
dos en el caso referido anteriormente, de que solamente el ju-
rado debe considerar la importancia de la prueba presentada
por el Fiscal hasta el límite en que la misma fué contradicha ó
refutada por los testigos del acusado, y por lo tanto, que estas
cuestiones no son objeto de revisión por la corte de apelación,
por motivc de errores. Si el veredicto fué evidentemente
contrario á la importancia de la prueba, el acusado debió ha-
ber hecho una moción solicitando nuevo juicio, bajo ese funda-
mento, en la corte inferior, pero la negación ó concesión de tal
moción es una cuestión discrecional en la corte sentenciadora.
Como regla general puede decirse que esta corte no revisará
la decisión del jurado sobre una cuestión de hecho, á no ser
que la misma sea evidentemente errónea, ó el resultado de
parcialidad, apasionamiento ó prejuicios.

La segunda objeción que el acusado hace á la sentencia de
la corte sentenciadora no tiene mejor fundamento. Es cierto

que el jurado recomendó al acusado á la clemencia de la corte, y que la corte le impuso de acuerdo con el veredicto pronunciado contra él, el grado máximo que la ley fijá. La recomendación del jurado indudablemente fué considerada debidamente por el juez sentenciador, pero dicho juez no estaba obligado á adoptar la recomendación, ni á mitigar ó rebajar la pena por tal motivo. La ley le hace responsable de la imposición de la pena (Código de Enjuiciamiento Criminal sec. 319), y el deber del jurado tan pronto da su veredicto de culpabilidad ó inculpabilidad, (Código de Enjuiciamiento Criminal, sec. 283), y en casos como este determina el grado del delito cometido, (Código de Enjuiciamiento Criminal, sec. 284).

Nuestro estatuto con respecto á veredictos, sección 283 del Código de Enjuiciamiento Criminal, es casi igual al de California, según se expresa en la sección 1151 del Código Penal de aquel Estado. Al interpretar un veredicto en el que se recomiende clemencia como sucede en el presente caso, dice la Corte Suprema de California:

"El jurado en su veredicto hacía una recomendación de clemencia. La corte ordenó que se registrase el veredicto sin hacer expresión de la recomendación. No hubo error de parte de la corte al dictar esta orden. La recomendación iba dirigida únicamente á la corte, y por lo tanto, no formaba parte del veredicto." (*People* v. *Lee,* 17 Cal., 79.)

Estamos completamente de acuerdo con esta decisión.

El jurado no debe extralimitar la ley incluyendo en su veredicto cosas que son pertinentes al mismo. Si hubieran de considerarse por la corte al pronunciar la sentencia las cuestiones referentes á recomendación de clemencia, deben entonces observarse las prescripciones del Código en sus secciones 320 y 321 (Código de Enjuiciamiento Criminal) que indican la manera en que dichas cuestiones deben presentarse. No hubo error alguno en el pronunciamiento de la sentencia que aparece en los autos basada en el veredicto del jurado.

Considerando la ley bajo este aspecto y tomando en consideración los hechos que aparecen de los autos, debe confirmarse en todas sus partes la sentencia dictada por la corte inferior.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Quiñones y Asociados, Hernández, Figueras y Wolf.